**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ELIZABETH THOMAS,                          :
                                           :
                          Plaintiff,        :          **REPORT AND**
                                           :          **RECOMMENDATION**
              - against -                   :
                                           :          **04 Civ. 3174 (KMW) (RLE)**
PICIO, et al.,                             :
                                           :
                          Defendants.       :

---

**To the HONORABLE KIMBA M. WOOD, U.S.D.J.:**

## I. INTRODUCTION

*Pro se* plaintiff, Elizabeth Thomas, brings this action against twenty-four defendants for

alleged civil rights violations under 42 U.S.C. § 1983: Picio, Maddox, C. Johnson, G. Vizzle, E.

Lord, Susan Schultz, Lieutenant Amarena, Sergeant Vallo, C.O. Jackson, C.O. Mattis,

Napolitano, C.O. C. Jannierre, M.D. Ortiz, Russo, Police Officer Hammond, Corrections Officer

Francis, Smith, C.O. Davis, A. Dixon, R. Fiorello, Nurse Jones, Debra Joy, Doctor Lewy, Lt.

West, and "John" or "Jane Doe" defendants (together, "Defendants). (These names appear here

as they appear in the Amended Complaint.) Thomas claims that Defendants violated her right to

the free exercise of religion guaranteed by the First and Fourteenth Amendments of the

Constitution, her Eighth Amendment right to be free from cruel and unusual punishment, her

rights under the Americans with Disabilities Act and the Rehabilitation Act of 1973, and

retaliated against her for the exercise of her First Amendment right to file grievances against

prison officials.

On June 25, 2004, District Judge Kimba M. Wood referred the case to the undersigned

for General Pretrial and Dispositive Motions. On December 6, 2006, Defendants moved for

summary judgment.  On February 28, 2007, Plaintiff cross-moved for summary judgment.  For the reasons that follow, I respectfully recommend that Defendants' motion be **GRANTED,** and Plaintiff's cross-motion be **DENIED**.

## II.  BACKGROUND

On March 9, 1994, Thomas was apprehended at New York's John F. Kennedy International Airport trying to smuggle approximately forty pounds of marijuana into the United States.  After a jury trial, she was convicted on March 3, 1995, of criminal possession of marijuana in the first degree, and was sentenced to an indeterminate prison term of from seven and one-half to fifteen years.

The facts alleged in Thomas's pleadings, which are accepted as true for purposes of this motion, follow from a series of incidents with prison officials between 2000 and 2005, while she was incarcerated at Bedford Hills Correctional Facility ("Bedford Hills") and at Taconic Correctional Facility ("Taconic").  Aside from this time frame, the occurrences are generally unconnected.  Her complaint recounts dozens of disparate incidents, and they will be discussed only to the extent necessary to frame the issues.

## III.  DISCUSSION

A.      **Legal Standard for Summary Judgment**

In evaluating a motion for summary judgment, the Court reviews the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, to determine if there exists a genuine issue of material fact to preclude the moving party from a judgment as a matter of law."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  Courts must accept the nonmoving party's evidence as true, *Russo v. City of Bridgeport,* 479 F.3d 196, 203

(2d Cir. 2007), and will view the facts and draw reasonable inferences in the light most favorable to that party, *Scott v. Harris*, 127 S.Ct. 1769, 1774 (2007). A nonmoving party cannot rely on conclusory allegations or speculation, and "may not rest on the pleadings[,] but must further set forth specific facts in the affidavits, depositions, answers to interrogatories, or admissions showing a genuine issue exists for trial." *Cifarelli v. Village of Babylon,* 93 F.3d 47, 51 (2d Cir. 1996). A genuine issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

**B.     Analysis of the Claims.**

**1. Substantive Claims**

*i.  Purportedly missing documents would have had no impact upon the outcome of Thomas's 440 motion.*

On January 31, 2001, Thomas filed a state court motion to vacate the judgment of conviction (N.Y.C.P.L. § 440.10(1)), and to set aside the imposed sentence (N.Y.C.P.L. § 440.20) (together, "440 motion"); she argued that she received ineffective assistance of counsel, and that the presiding judge improperly made a finding of fact regarding the "amount of marijuana involved in defendant crime" (John Knudsen Decl. ("Knudsen Decl."), Ex. A, Notice of Motion, 1-2[1]). On February 1, 2001, C.O. Jackson and C.O. Matis searched her cell and confiscated certain documents that she alleges were pertinent to the 440 motion. On February 2, 2001, some of those documents were returned. Thomas contends that the still missing documents compromised her 440 motion. (*See* Am. Compl. ¶¶ 6-10.)

---

[1]Because the exhibits attached to John Knudsen's Declaration include various, unrelated documents, the citation adds additional identifying information.

For their part, Defendants argue that Thomas's § 1983 claim must be dismissed because (1) she was tardy in raising it, (2) all of the confiscated documents were returned to her, and (3) any missing documents would not have impacted her 440 motion.

<u>Timeliness</u>

Thomas filed her complaint on February 13, 2004, when she gave it to prison officials for transmittal to the Court. *See Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir. 1993). For federal courts sitting in New York, the statute of limitations for bringing § 1983 claims is three years. *See Patterson v. County of Oneida,* 375 F.3d 206, 218 (2d Cir. 2004). Defendants contend that Thomas's claim accrued on February 1, 2001, and that she had to file her complaint by February 1, 2004, for it to be timely. Defendants' position does not address whether the pendency of grievances by Thomas might toll the statue of limitations. Since Congress did not establish a body of tolling rules applicable to § 1983 actions, courts borrow "the state law of limitations governing an analogous cause of action." *Bd. of Regents v. Tomanio*, 446 U.S. 478, 483-84 (1980); *see also Taylor v. N.Y. State Dep't of Corr.*, No. 03 Civ. 1929 (PKC), 2004 WL 2979910, at *10 (S.D.N.Y. Dec. 22, 2004) ("we borrow not only a state's limitations period but also its 'tolling rules'") (*citing Pearl v. City of Long Beach,* 296 F.3d 76, 80 (2d Cir. 2002), *and McCoy v. Goord,* 255 F. Supp. 2d 233, 253 (S.D.N.Y. 2003)); *see also Hardin v. Straub*, 490 U.S. 536, 539 (1989) ("Limitations periods in § 1983 suits are to be determined by reference to the appropriate state statute of limitations and the coordinate tolling rules . . . ."). Under New York law, "[w]here the commencement of an action has been stayed by a court or by statutory prohibition, the duration of the stay is not part of the time within which the action must be commenced." N.Y. C.P.L.R. § 204(a). The Prison Litigation Reform Act of 1996 ("PLRA")

4

operates as a "statutory prohibition" because it provides that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any . . . correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life . . . ." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Therefore, since Thomas could not commence her action without first exhausting her administrative remedies, the statute of limitations was tolled during the pendency of her grievances. Thomas exhausted the administrative remedies available to her on April 4, 2001, therefore she was free to file this action until April 4, 2004.

Incomplete return of documents and their relevance

A question of material fact remains as to whether all of Thomas's documents were returned. Defendants argue that Thomas acknowledged that all of her paperwork was returned when she signed an itemized list, but Thomas contends that her signature only acknowledged the presence of certain officers, the time of the search, and the number of the cell searched.

Even though it is not possible to know the meaning of Thomas's signature at this point, the purportedly missing documents would have had no impact upon the outcome of her 440 motion. "[A]ll persons enjoy a constitutional right of access to the courts . . . ." *Monsky v. Moraghan*, 127 F.3d 243, 246 (2d Cir. 1997). "In order to establish a violation of a right of access to courts, a plaintiff must demonstrate that a defendant caused 'actual injury.'" *Id.* at 247 (*citing Lewis v. Casey*, 518 U.S. 343 (1996)). Defendants argue that since Thomas had "already filed her 440 motion in state court on January 31, 2001, prior to [the alleged confiscation]," she cannot demonstrate that the lost documents would have altered the outcome of the motion, which was denied. (Def.'s Mot. for Summ. J. at 5-6.) Thomas contends that she "thought the

5

procedure was to file a motion [,] wait for response [,] then prove her argument," and believes that if her documents had not been confiscated she would have submitted them, and the outcome might have been different. (Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Pl.'s Resp.") at 5.)

Thomas's 440 motion was denied by the Queens County criminal court on March 23, 2001. The court found that, since the issues she raised in her 440 motion were either previously determined unfavorably by the appellate court upon direct appeal, or could have been, but were not, raised in her direct appeal, her motion to vacate had to be denied. The court also found that her allegations regarding an improper jury charge were without merit since the trial court had instructed the jury "in great detail" on the proper considerations (Knudsen Decl., Ex. A, Randall T. Eng March 23, 2001 Memorandum at 2), and that her sentence was appropriate in light of the relevant statutory guidelines. Therefore, even if the Court credits her claim that certain documents have not been returned, Thomas cannot demonstrate that the documentation she sought to submit would have influenced the state's determination. The relevant facts were available in the record of the trial and appellate proceedings.

*ii. Defendants responded reasonably to the risk to Thomas.*

Thomas was attacked on February 7, 2001, by another inmate with whom she had a shared history of conflict. Thomas alleges that Superintendent Lord and Lt. Amarena were aware of a substantial risk to her safety as early as January 26, 2001, and contends that C.O. Napolitano breached a duty owed to her when he failed to protect her "from foreseeable harm." (Am. Compl. ¶ 24.) Failure to protect claims are subject to Eighth Amendment scrutiny. *Farmer v. Berman*, 511 U.S. 825, 832 (1994). The Eighth Amendment is violated when an inmate shows that prison officials displayed "deliberate indifference to [her] health or safety." *Id.* at 834. To

establish that prison officials were deliberately indifferent, a plaintiff must show that she was incarcerated under conditions posing a substantial risk of serious harm, that defendants were aware of the risk, and that they disregarded the "risk by failing to take reasonable measures to abate the harm." *Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir. 1996).

Defendants only address the deliberate indifference component. They explain that "[R]ather than disregard the risk," they "offered plaintiff protective custody," which she refused. (Def.'s Mot. for Summ. J. at 7.) Defendants point to a February 2, 2001 memorandum wherein Thomas insisted that she did not believe that her safety was in jeopardy, and declined Defendants' offer of protective custody. (Knudsen Decl., Ex. C., 6-22-06 79.) Since Defendants responded reasonably to the risk to Thomas when they offered to place her into protective custody, and Thomas does not question the authenticity of the February 2001 memorandum or present any evidence from which a reasonable factfinder could conclude that their claim of an offer of protective custody was questionable, there is no genuine issue of material fact.

*iii.   Thomas's free exercise of her religion was not substantially burdened.*

"Prisoners have long been understood to retain some measure of the constitutional protections afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003). "[P]rison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1987).

Thomas argues that Defendants infringed upon her right to freely exercise her religion because on certain occasions, her kosher meals were either not delivered or delivered in an

unacceptable condition (Am. Compl. ¶¶ 76, 78, 83), and she alleges that she was housed in a cell without an electrical socket, thereby preventing her from heating water necessary to prepare proper kosher meals (*id.* at ¶¶ 79, 81).

In bringing a free exercise claim, a plaintiff must demonstrate that her religious beliefs are sincerely held, *see Fifth Ave. Presbyterian Church v. City of New York,* 293 F.3d 570, 574 (2d Cir. 2002), and that the prison's practice imposes a substantial burden on her religious exercise without being reasonably related to a legitimate penological interest, *Ford,* 352 F.3d at 594. Defendants do not contest the sincerity of Thomas's beliefs. The Court is therefore left to consider the extent to which Thomas's religious exercise was burdened by their conduct. Generally, the relevant inquiry is whether participation in a certain activity is considered central or important to plaintiff's practice of her faith. *Id.* at 593. Courts in this circuit have found that certain severe constraints are legally sufficient to establish a substantial burden on a prisoner's religious exercise. *See, e.g., Jean-Laurent v. Wilkerson,* 438 F. Supp. 2d 318 (S.D.N.Y. 2006) (finding that a Muslim petitioner suffered a substantial burden on his free exercise when he was strip searched in a hallway although his faith did not permit him to be seen naked by strangers); *Marria v. Broaddus,* No. 97 Civ. 8297 (NRB), 2003 WL 21782633 (S.D.N.Y. July 31, 2003) (finding that plaintiff's free exercise of his religious belief was substantially burdened by policy that completely banned his religious group's literature and symbols, and prevented him from engaging in any organized activities associated with the group); *Cancel v. Mazzuca,* No. 01 Civ. 3129 (NRB), 2003 WL 1702011, at *11 (S.D.N.Y. Mar. 28, 2003) (finding that "plaintiff's allegations that his religious liberty was burdened by a comprehensive system of religious discrimination established at the direction of the Department of Correction's Islamic authorities,"

who were members of a rival sect, stated a valid constitutional claim).

The restraints that may have burdened Thomas do not rise to these levels. Even were the Court to credit the supposition that proper kosher meals are critical to her observances, Thomas has not advanced any facts sufficient to create a genuine issue for trial as to whether anything more than a *de minimus* burden interfered with her religious exercise since her dietary needs were, by and large, honored. While Thomas's complaint asserts that she did not receive kosher meals during Passover 2001 (Am. Compl. ¶ 78), she does not dispute the accuracy of contemporaneous records that indicate that while she was offered kosher meals during Passover, and refused them because they were "open and exposed" (Knudsen Decl., Ex. F, 6-22-06 493), she was provided with substitutions. Furthermore, she never elaborates upon her broad and conclusory allegation that "there were always problems with her kosher meals" (Knudsen Decl., Ex. D, Thomas Dep. ("Thomas Dep.") at 174), an allegation that is insufficient to create a fact issue. Although there were no electrical sockets in her cell, Thomas does not dispute that she was allowed to use other cells with electrical outlets to make hot water. Defendants argue that Thomas's complaints about her meals were addressed quickly and that she was accommodated by prison staff. So long as the record is devoid of anything purporting to challenge these explanations, Thomas does not advance any evidence from which a reasonable trier of fact could conclude that her religious exercise was substantially burdened.

Thomas also contends that she was deprived of the services of a religious counselor on several occasions (Am. Compl. ¶ 76). The Supreme Court has explained that "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'Lone,* 482 U.S. at 348

(*quoting Price v. Johnston,* 334 U.S. 266, 285 (1948)). "The need for religious services and counseling of a particular frequency and character necessarily depends on the character of the prison population and, unlike the need for Kosher food, cannot be met practically on an individual basis." *Prins v. Coughlin,* No. 94 Civ. 2053 (MBM), 1995 WL 378526, at *2 (S.D.N.Y. June 26, 1995). Thomas has failed to meet the threshold requirement of *Ford*'s substantial burden test: she has advanced no facts to support a finding that the unavailability of a religious counselor on certain occasions severely compromised her ability to engage in an activity central to her practice of her faith. The record does not demonstrate that her ability to freely exercise her religion was substantially impacted.

> *iv. Defendants responded adequately to Thomas's medical needs.*

Thomas claims that Defendants violated the Eighth Amendment's prohibition against cruel and unusual punishment by being deliberately indifferent to a serious medical condition on four occasions. First, she alleges that, following the February 7, 2001 attack that caused her to suffer "extreme pain to the head, neck and shoulders" (Am. Compl. ¶ 85), more than a month elapsed before she was offered any pain medications for her extreme migraines (*Id.* at ¶ 87). Second, she alleges that doctors refused to order any tests to determine the cause of her migraines (*Id.* at ¶ 88). Third, she alleges that doctors refused to prescribe any treatment for her migraines (*Id.*). Finally, she alleges that, contrary to the recommendation of an orthopedic specialist, Defendants did not provide her with a back brace to alleviate her lower back condition (*Id.* at 90).

To pursue a claim that a medical condition constitutes cruel and unusual punishment in violation of the Eighth Amendment, a plaintiff must show that her medical condition was an objectively serious one, and that defendants acted with deliberate indifference to her medical

needs. *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). To establish deliberate indifference, she must show that Defendants had "a state of mind that is the equivalent of criminal recklessness." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir. 2003) (*quoting Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). Although it is doubtful that Thomas's migraines and lower back condition constituted serious medical conditions, s*ee Chance v. Armstrong,* 143 F.3d 698, 702-703 (2d Cir. 1998) ("[A] serious medical condition exists where the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Factors that have been considered include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.") (internal citations omitted), there is no evidence to suggest that Defendants ignored an excessive risk of serious harm to Thomas. The record indicates that she was treated soon after the February 7 attack (Knudsen Decl., Ex. H, 21006 134), and was seen by Dr. Lewy several times during the subsequent months (*Id.* at 21006 182-83). Thomas was given three different medications for her migraines (Def.'s Mot. for Summ. J. at 19), and her medication charts show that medical personnel regularly dispensed prescription medication to her once it had been prescribed (Knudsen Decl., Ex. H, 21006 182). Thomas acknowledges that whenever she was unable to retrieve medication, a nurse brought it to her (Thomas Dep. at 199). Furthermore, even after the completion of discovery, Thomas has adduced no evidence to substantiate her contention that an outside specialist recommended that she be provided with a back brace. When prompted, she was not able to recall any conversation with the doctor who treated her at Bedford Hills, Dr. Lewy, about a back brace or recall when a

specialist recommended that she use one (*See* Thomas Dep. at 212-16). Also, in her response to Defendants' motion for summary judgment, she relies again on her conclusory claim that Dr. Lewy "never followed the Orthopedic Specialist order for a back brace" (Pl.'s Resp. at 21). Even were the Court to credit Thomas's assertions, the need for a back brace is "a classic example of a matter for medical judgment," and does not represent cruel and unusual punishment; at most, it could constitute medical malpractice. *Estelle v. Gamble,* 429 U.S. 97, 107 (1976). The record presents no evidence from which a reasonable factfinder could conclude that Defendants were unresponsive to Thomas's needs or that the medical treatment she received was so inadequate as to implicate her constitutional rights.

*v. Thomas's disciplinary hearing did not violate due process.*

Thomas alleges that Officers Jannierre and Ortiz, and Sergeant Russo, issued her a false misbehavior report in August 2001, which subjected her to a disciplinary hearing, and resulted in her being locked in a cell for twenty-three hours a day for sixty days (Am. Compl. ¶ 59). Defendants argue that since § 1983 does not give her a cause of action for being falsely accused, Thomas can only challenge the legitimacy of the disciplinary hearing. Indeed, while Thomas "has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," she does have a "right not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir. 1986). Relying on *Sandin v. Conner*, 515 U.S. 472, 484 (1995), Defendants argue that Thomas's confinement to a cell for twenty-three hours a day for sixty days did not implicate a liberty interest because her confinement did not reflect an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." (Def.'s

Mot. for Summ. J. at 26.)

"Factors relevant to determining whether the plaintiff endured an atypical and significant hardship include the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation imposed compared to discretionary confinement." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (*quoting Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir. 1998)) (internal quotation marks omitted). "[C]onfinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU [Severe Housing Unit] conditions . . . ." *Id.* at 65. "Under the normal conditions of SHU confinement in New York, the prisoner is [] placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day, limited to two showers a week, and denied various privileges available to general population prisoners . . . ." *Id.* at 65 n.3 (*quoting Colon v. Howard*, 215 F.3d 227, 230 (2d Cir. 2004)). Thomas does not allege that she had to endure anything beyond these typical SHU conditions. Therefore, so long as Thomas has not presented any facts to permit a conclusion of atypical and significant deprivation such that her liberty interest may have been violated, the Court need not reach the question of whether the hearing violated her liberty interests. There is insufficient evidence to allow a reasonable jury to find that the punishment imposed as a result of her disciplinary hearing violated due process.

> *vi. Defendants did not violate the ADA or the Rehabilitation Act.*

Thomas alleges that Defendants discriminated against her in violation of the Americans with Disabilities Act of 1990 ("ADA") and the Rehabilitation Act of 1973 when, in February 2002, they refused to allow her to "participate in Vocational Rehabilitation Programs, or work

13

Programs due to [her] disability" (Pl.'s Resp. at 28). Defendants contend that Thomas was neither disabled nor regarded as disabled, and therefore she is precluded from pursuing a claim under the ADA.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity." 42 U.S.C. § 12132. A plaintiff alleging a Title II violation must show that

> (1) he or she is a "qualified individual with a disability;" (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) the entity which provides the service, program or activity is a public entity.

*Clarkson v. Coughlin,* 898 F. Supp. 1019, 1037 (S.D.N.Y. 1995) (*citing* 42 U.S.C. § 12132). The term "qualified individual with a disability" is defined by the ADA as an individual who suffers from an "impairment that substantially limits one or more of the major life activities." 42 U.S.C. § 12102(2)(A). Similarly, in order to bring a claim under § 504 of the Rehabilitation Act, an individual must demonstrate that she suffers from a disability, which the Act defines as a "physical or mental impairment." 29 U.S.C. § 705(20)(A)(1); *see also Rothschild v. Grottenthaler*, 907 F.2d 286, 289-90 (2d Cir. 1990).

When asked whether she suffered from a disability while incarcerated, Thomas said she did not (Thomas Dep. at 233). She therefore cannot satisfy the first element of an ADA claim. While it is possible for non-disabled individuals to qualify for ADA protection if they are "regarded" as having a disability, 42 U.S.C. § 12102(2)(c), and while Thomas claims that Defendants regarded her as being disabled, (Pl.'s Resp. at 28), she does not proffer any evidence

14

to enable a reasonable factfinder to conclude that she was so regarded.  Whether an individual is regarded as having a disability depends on the perception of the public entity allegedly discriminating against her, and is therefore a question of intent.  *Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 646 (2d Cir. 1998) (*citing Francis v. City of Meriden,* 129 F.3d 281, 284 (2d Cir. 1997)).  While Defendants concede that they believed Thomas suffered from a back condition, they dispute that they believed she was disabled under the ADA.  *See id.* (it is not enough for defendant to regard plaintiff as "somehow disabled," rather, the plaintiff must show that defendant regarded her as disabled within the meaning of the ADA).   The only evidence Thomas advances to support her contention that Defendants regarded her as disabled is their denial of her requests to participate in "a wide range of counseling, education, and vocational programs offered to other inmates," a decision, she argues, that her lower back condition motivated.  (Am. Compl. ¶ 104.)  To prevail, Thomas is required to adduce evidence that Defendants regarded her "as having an impairment that substantially limited a major life activity."  *Colwell,* 158 F.3d at 646.  Thompson has presented no evidence that creates a genuine issue of material fact concerning her claim that Defendants regarded any putative impairment as substantially limiting her in a major life activity.   "Major life activities include functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."  *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 722 (2d Cir. 1994) (*quoting* 45 C.F.R. § 84.3(j)(2)(ii) (1989)) (internal quotation marks omitted).  While Defendants' perceptions may have precluded Thomas from participating in certain kinds of vocational activities, and while "the ability to work is considered a 'major life activity,'" Thomas needed to make a showing that Defendants believed she was "significantly restricted in the ability to

perform either a class of jobs or a broad range of jobs." *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 872 (2d Cir. 1998) (*quoting* 29 C.F.R. § 1630.2 (j)(3)(i)); *see also Heilweil,* 32 F.3d at 723 ("An impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one."). Thomas has not raised a triable issue surrounding whether Defendants "perceived her as incapable of working in a broad range of jobs suitable for a person of her age, experience, and training because of her disability." *Id.* While she was unable to take advantage of all of the vocational activities offered by Defendants, she was given opportunities to participate in certain vocational activities that Defendants deemed safe and not unduly strenuous.

## 2. Retaliation Claims

Thomas alleges that prison officials retaliated against her nine times for filing grievances and complaining to federal agencies about conditions at the facilities. According to Thomas, prison officials retaliated against her on February 16, 2001, when they placed her into involuntary protective custody (Am. Compl. ¶ 15); on February 23, 2001, when they denied her application for work release (*Id.* at ¶ 95); on or around February 26, 2001, when her appeal of that determination was denied (*Id.* at ¶ 98); on March 8, 2001, when her request to be transferred to another facility was denied (*Id.* at ¶ 66); on June 5 and June 6, 2001, when she was denied an escort to a medical appointment (*Id.* at ¶ 91); on June 7, 2001, when she was "ordered to lift heavy bags" despite a back condition (*Id.* at ¶ 92); on or around March 29, 2004, when they "used improper disciplinary procedures to punish" her (*Id.* at ¶ 125); and on or around March 29, 2004, when a nurse "requested the facility to punish [her] for experiencing side effects to new medications for migraine headaches" (*Id.* at ¶ 126).

When Thomas files grievances or complains to agencies, she engages in activity protected

under the First Amendment. *See White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1059 (2d Cir. 1993) ("The First Amendment right to petition the government for a redress of grievances, which is an assurance of a particular freedom of expression, is generally subject to the same constitutional analysis as the right to free speech.") (*quoting McDonald v. Smith,* 472 U.S. 479, 482 (1985), *and Wayte v. United States,* 470 U.S. 598, 610 n.11 (1985)) (internal quotation marks omitted). To sustain a First Amendment retaliation claim, Thomas must demonstrate that the her conduct was protected, that Defendants took adverse action against her, and that there was a causal connection between her protected activity and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir. 2004) (*quoting Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir. 2001)). The Court approaches Thomas's retaliation claims "with skepticism and particular care because such claims are easily fabricated and may cause unwarranted judicial interference with prison administration." *Islam v. Goord,* No. 05 Civ. 7502 (RJH), 2006 WL 2819651, at *4 (S.D.N.Y. Sept. 29, 2006) (*quoting Dawes* 239 F.3d at 491) (internal quotation marks omitted).

> *i. Defendants did not take adverse action against Thomas when they placed her into protective custody.*

Thomas alleges that on February 16, 2001, under the pretext of protecting her from another inmate, Lt. Amarena placed her in involuntary protective custody as punishment for "filing a grievance and petitioning the courts." (Am. Compl. ¶ 33.) Defendants argue that, following a February 14, 2001 letter from Thomas stating that she did not feel safe because of the threats of another inmate, they recommended that she be placed in protective custody. When Thomas refused to be placed in protective custody, a hearing was conducted and a determination

was made that she should be placed in involuntary protective custody.

Thomas has not shown that Defendants took an adverse action against her when they put her into involuntary protective custody. "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Dawes,* 239 F.3d at 493. "In making this determination, the court's inquiry must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more . . . than average citizens, before a retaliatory action taken against them is considered adverse." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir. 2003) (*quoting Dawes,* 239 F.3d at 493) (internal quotation marks and brackets omitted).

Furthermore, Thomas cannot show that Defendants did not have a legitimate reason for putting her into protective custody –that "even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin,* 344 F.3d 282, 287-88 (2d Cir. 2003). Thomas has the "initial burden of showing that an improper motive played a substantial part in defendant's action. The burden then shifts to defendant to show it would have taken exactly the same action absent the improper motive." *Id.* "[S]tate action taken on the basis of both valid and invalid motivations is not constitutionally tainted by the invalid motive if the action would in any event have been taken on the constitutionally valid basis." *Sher v. Coughlin,* 739 F.2d 77, 82 (2d Cir. 1984). Since Thomas had a shared history of violence with another inmate, and since she asked to be separated from the other inmate, she has shown no more than that Defendants may have had mixed motives for assigning her to protective custody. As Thomas acknowledges, Defendants put her into protective custody for legitimate reasons: in a March 3, 2001 appeal of

Defendants' determination, Thomas explains that she "agreed with . . . [the recommendation] that I should be placed in Protective Custody as there is no other way to ensure my safety . . . ." (Knudsen Decl., Ex. D, Superintendent's Hearing at 3.)  Therefore, even construing all of the facts in a light favorable to Thomas, any adverse effect it might have had on her filing grievances against prison officials in the future would have been *de minimus*.

> *ii.  Thomas did not exhaust her claim that she was denied work release in retaliation for filing grievances.*

Thomas alleges that between February and April 2003, she was repeatedly denied work release in retaliation for having filed grievances and lawsuits against the prison and its officials (Am. Compl. ¶ 99).  Defendants assert that Thomas has not exhausted "her administrative remedies with respect to any potential retaliation claim arising from her work release decisions" (Def.'s Mot. for Summ. J. at 28), and her claim should be dismissed.

The PLRA requires Thomas to exhaust all available administrative remedies before filing suit for illegal retaliation in federal court.  *See Porter,* 534 U.S. at 532; *see also Giano v. Goord,* 380 F.3d 670, 675 (2d Cir. 2004).  By her own admission, Thomas did not grieve her retaliation claim: when asked during her deposition whether she filed "a grievance regarding this retaliatory work release denial," she answered "no."  (Thomas Dep. at 226.)  Since there is no evidence from which a reasonable factfinder could conclude that this claim was properly grieved, it must be dismissed.

> *iii.  The illegitimate denial of transfer claim is time-barred.*

Thomas alleges that on February 23, 2001, she requested a transfer to another facility, and her request was denied on March 8, 2001 (Am. Compl. ¶¶ 65, 66).  She claims that the denial of

transfer was in retaliation for filing grievances against the facility (*Id.* at ¶ 70). Defendants argue that this claim should be dismissed because (1) Thomas did not exhaust her administrative remedies, (2) the denial of transfer does not rise to the level of a constitutional violation, and (3) Thomas never named any defendants associated with her denial of transfer, instead naming "John Doe" defendants (Def.'s Mot. for Summ. J. at 13-14).

The record does not settle whether Thomas exhausted her administrative remedies on this claim. Defendants point to her ambiguous deposition testimony where she stated that whereas she did not file a grievance, she had used the procedure provided by the prison, explaining that "[i]f something has its own administrative remedy, then you have to use that remedy" (Thomas Dep. at 153-54). Thomas did not explain this further, and Defendants did not clarify this statement at the deposition. Furthermore, Defendants have submitted no evidence demonstrating there was no alternate procedure or that Thomas's understanding of the proper grievance procedure was wrong. On this record, a reasonable trier of fact could conclude that Thomas availed herself of the available administrative remedies, that Defendants' actions inhibited her exhaustion of remedies, or that special circumstances justified her failure to comply with administrative procedural requirements. *See Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir. 2004) (establishing three part inquiry into whether a plaintiff can overcome defendant's contention that she has failed to exhaust available remedies as required by the PLRA). Therefore, a genuine issue of material fact remains.

Thomas's claim must nevertheless be dismissed because she never named any of the individuals who might have been responsible for denying her transfer. Although she filed her complaint naming the defendant officials as "John Does" within the three year statute of

limitations, "[i]t is familiar law that 'John Doe' pleadings cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party in effect constitutes a change in the party sued." *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1075 (2d Cir. 1993) (internal citations omitted). At this point in the litigation, her claims against "John Does" are time-barred since she never moved for leave to amend the complaint to add any new defendants.

  *iv. There is no causal connection between any grievance and the denial of a medical escort or the order to lift heavy bags.*

  Thomas alleges that on June 5 and 6, 2001, in retaliation for grieving prison conditions, she was forced to miss medical appointments because she was denied an escort, causing her "unnecessary extreme pain and delay in medical treatment." (Am. Compl. ¶ 91.) She also alleges that on June 7, 2001, she was "ordered to lift heavy bags" (*Id.* at ¶ 92), also resulting in extreme pain. Thomas does not adduce enough evidence for a jury to find that Defendants retaliated against her on these dates, however, as she offers no evidence to suggest that any of these incidents were causally linked to her grievances. When asked about them during her deposition, she explained that her allegations derived from the supposition that "anything they did was an act of retaliation," although in these instances she could not venture a guess about what they might have been retaliating for: "[t]hey retaliated for too many things for me to narrow down what that would have been for." (Thomas Dep. 219-20.) Thomas does not create a genuine issue for trial concerning whether her grievances caused Defendants to deny her an escort or to lift heavy bags.

  *v. No causal connection between grievance and disparate treatment.*

  Thomas claims that C.O. Francis and Sergeant Smith retaliated against her for filing an ADA complaint with the Department of Justice by searching her legal papers and asking her

about her legal actions.  (Am. Compl. ¶ 109.)  Defendants contend that Thomas cannot establish a causal connection between these actions and her contact with the Department of Justice (Def.'s Mot. for Summ. J. at 31).

Even if Thomas's allegations are credited, she fails to create a genuine issue of material fact concerning whether Defendants' alleged actions were caused by her complaint.  Thomas's bare conjectures fail to create a genuine issue for trial.  When asked during her deposition for the basis of her belief that these actions were taken against her in retaliation for having filed a grievance, she answered, "I can't think of any other reasons" (Thomas Dep. at 249).  "Conclusory allegations . . . are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."  *Scott,* 344 F.3d at 287.  Thomas admitted that she did not know whether Smith or Officer Francis was aware of the Department of Justice's investigation into her claims (*id*. at 246-51).  In any event, a cell search cannot sustain a retaliation claim.  Because the Fourth Amendment does not apply to the cells of inmates, a cell search cannot constitute an adverse action likely to dissuade her from engaging in protected activity to vindicate her rights.  *See Allah v. Greiner,* No. 03 Civ. 3789 (NRB), 2004 WL 1713811, at *4 (S.D.N.Y. July 29, 2004) (*citing Hudson v. Palmer*, 468 U.S. 517, 526 (1984)) ("prisoners have no right to be free from searches, even if those searches are conducted in retaliation for a prisoner's exercise of his constitutional rights"); *Battice v. Phillip,* No. CV-04-669 (FB) (LB), 2006 WL 2190565, at *7 (E.D.N.Y. Aug. 2, 2006) ("The Second Circuit has not addressed whether a cell search can constitute an adverse action for purposes of a First Amendment retaliation claim; however, many district courts in this circuit have concluded that it does not.").  Thus, Thomas has "alleged no special deprivation that would deter a prisoner,

whose cell can be searched at any time, and whose interactions with the outside world are subject to extensive regulation by prison authorities from continuing to file grievances against prison officials." *Salahuddin v. Mead*, No. 95 Civ. 8581 (MBM), 2002 WL 1968329, at *5 (S.D.N.Y. Aug. 26, 2002) (internal citations omitted).

*vi. There is no allegation that Thomas engaged in any protected activity.*

Thomas alleges that on or around February 10, 2004, a misbehavior report was issued against her by Sergeant Smith, which she believes was written in retaliation for having some baby pictures and construction paper "for the making of cards and posters for baby recreation area." (Am. Compl. ¶ 115.) She also alleges that on or around March 29, 2004, Superintendent Dixon, retaliated against her by subjecting her to "improper disciplinary procedures," and Nurse Jones retaliated against her for "experiencing side effects to new medication for migraine headaches." (Am. Compl. ¶ 126.)

Thomas cannot sustain a retaliation claim because she does not demonstrate that her participation in a protected activity gave rise to the putatively illegitimate conduct. Her response to Defendants' motion for summary judgment, which purports to elaborate upon these allegations, provides no guidance as to what protected conduct she thinks caused Superintendent Dixon's conduct, and maintains that Nurse Jones retaliated against her for experiencing nausea and vomiting a pill that she had ingested. Thomas's description of events fails to make a showing that the conduct at issue here was protected. Furthermore, even if the Court proceeds from the assumption that the conduct at issue was protected, Thomas does not proffer any evidence of a causal connection between her engagement in possible protected activity and whatever adverse actions may have followed. These allegations are pure surmise, and are

insufficient to provide a basis from which a reasonable factfinder could conclude that her constitutional rights were violated.

## IV. CONCLUSION

I recommend that Defendants' motion for summary judgment be **GRANTED** and Thomas's cross motion be **DENIED.**

Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have ten (10) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Kimba M. Wood, 500 Pearl Street, Room 1610, and to the chambers of the undersigned, Room 1970. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn,* 474 U.S. 140, 150 (1985); *Small v. Sec'y of Health and Human Services,* 892 F.2d 15, 16 (2d Cir. 1989) *(per curiam)*; 28 U.S.C. § 636(b)(1) (West Supp. 1995); Fed. R. Civ. P. 72, 6(a), 6(c).

**DATED: February 15, 2008**
**New York, New York**

**Respectfully Submitted,**

*Fonold*

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**

24

Copies of this Report and Recommendation were sent to:

*Pro se* plaintiff:     Elizabeth Thomas
                        8202 or 82020 Terra Valley Lane
                        Tomball, TX   77375

Defendants:             Brian Joseph Schmidt
                        John E. Knudsen
                        Kimberly Anne Dasse
                        Office of the Attorney General
                        120 Broadway
                        New York, NY 10271